IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| I LOVE JUICE BAR FRANCHISING, LLC, | ) ) ) | |
| Plaintiff, | ) ) | NO. 3:19-cv-00981 |
| v. | ) ) | JUDGE RICHARDSON |
| ILJB CHARLOTTE JUICE, LLC; and BRIAN MACINTOSH, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff's I Love Juice Bar Franchising, LLC's Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"), filed on November 4, 2019. (Doc. No. 4). Defendants ILJB Charlotte Juice, LLC ("ILJB Charlotte") and Brian MacIntosh have responded (Doc. No. 10, the "Response"); and Plaintiff has replied (Doc. No. 14, the "Reply").

For the reasons discussed below, the Motion will be granted (if and when Plaintiff posts security as required by the Court) as to Plaintiff's request for a Temporary Restraining Order. The scope of the Temporary Restraining Order is outlined below. As to Plaintiff's request for a preliminary injunction, a timely hearing will be scheduled.

## BACKGROUND

A. Factual Background[1]

Plaintiff, I Love Juice Bar Franchising, LLC ("Juice Bar"), is a Tennessee limited liability company engaged in the business of franchising independent businesspersons to operate I Love

---

[1] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by

Juice Bar franchised businesses throughout the United States. I Love Juice Bar franchisees are licensed to use the trade names, service marks, and trademarks of I Love Juice Bar and to operate under the I Love Juice Bar system, which involves the production, merchandising, and sale of blended-to-order fruit and vegetable juices and smoothies and related products. I Love Juice Bar Holdings, LLC ("ILJB Holdings") is the owner of the trademarks, service marks, logos, emblems, trade dress and trade name "I Love Juice Bar," and related marks.[2] Currently, there are approximately forty I Love Juice Bar shops across the southern and midwestern United States.

In or about May 2017, Juice Bar and ILJB Charlotte entered into two franchise agreements ("Franchise Agreements"), which authorized ILJB Charlotte to operate two I Love Juice Bar franchised businesses in Charlotte North Carolina—one at each of two different stores. At the time the Franchise Agreements were executed, Defendant Brian MacIntosh and Stanley Parrish jointly owned ILJB Charlotte. MacIntosh personally guaranteed ILJB Charlotte's obligations under the Franchise Agreements. In 2018, Defendant MacIntosh and Parrish began negotiations with one another to end their joint ownership of ILJB Charlotte.

In December 2018, Defendants requested an early termination of the Franchise Agreements. On December 31, 2018, Dedria Ryan, the former CEO of Juice Bar, sent Defendants an early termination letter ("Termination Offer"), which included a provision for a termination fee

---

one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

[2] In the Complaint, Plaintiff asserts that "[e]ffective in July 2014, ILJB Holdings licensed the Marks and the System to [Juice Bar] under a trademark license agreement. [Juice Bar] has been granted a worldwide license of the Marks and System with the exclusive right to franchise the Marks and the System for 50 years. [Juice Bar] has used the Marks continuously since May 2015 to identify I love Juice Bar shops, and the juices and other products associated with those shops." (Doc. No. 1 ¶ 16).

of $5000 and a noncompetition provision. According to Defendants, after sending Defendants the Termination Offer on December 31, 2018, Ryan effectively amended its terms by authorizing the removal of these two provisions. Notably, Plaintiff disputes that Ryan ever agreed to amend the terms of the Termination Offer.

Shortly thereafter, Ryan left her employment with Juice Bar and was replaced in the CEO position by Molly Murphy. On April 18, 2019, Murphy traveled to Charlotte and met with MacIntosh regarding his two franchised stores.

In or around the week of September 9, 2019, Defendants transitioned to a new Point of Sale System, to which Juice Bar requested access. Defendants informed Juice Bar that they would give it access to the new system and the franchised businesses' sales and royalties data. To date, however, Defendants have not provided Juice Bar with access to their new Point of Sale system and/or their sales and royalties data.

In September 2019, MacIntosh and Parrish resolved their ownership dispute, and the shares previously owned by Parrish were transferred to Clif Gentle. On or around September 19, 2019, ILJB Charlotte returned a signed copy of the Termination Offer to Plaintiff. On the Termination Agreement returned to Plaintiff, Defendant crossed through the provision requiring Defendants[3]

---

[3] At times the Court herein refers to *Defendants* (plural) when plainly, or at least arguably the particular obligation or circumstance referred to is applicable only to ILJB Charlotte. This occasional intentional non-specification of ILJB Charlotte as the Defendant in question is done merely for ease of reference and purposes of discussion. It is not necessarily meant to declare conclusively that the particular obligation or circumstance does in fact apply to the individual Defendant as well as the corporate Defendant, and such applicability (or lack of applicability) has no impact on the Court's decision on the request for a TRO. The injunction, however, pursuant to Rule 65, will apply to each defendant (as well as each defendant's officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them or the defendant) having notice of the TRO.

to pay a $5000 termination fee and the provision prohibiting Defendants from operating a "[c]ompeting [b]usiness" as defined by the Franchise Agreements.

Thereafter, Defendants began operating Queen City Juicery & Wellness Bar ("Queen City Juicery") out of the each of the same two locations formerly operated as I Love Juice Bar franchises. Queen City Juicery sells fresh juices, smoothies, and plant-based products.

B. Procedural History

On November 4, 2019, Plaintiff commenced this action by filing a Verified Complaint (Doc. No. 1) and the Motion. Defendants responded in opposition to the Motion on November 7, 2019. On November 8, 2019, the Court ordered: (1) Plaintiff to file a reply to Defendants' Response, addressing only matters within the scope of the Response; and (2) Defendants to file (or explain why they are unable to file) an affidavit or declaration attaching and authenticating Dedria Ryan's "emails [plural]" referenced in the last full sentence of page four of the Response and (if not encompassed among those emails) the "email confirmation" referenced in paragraph eight of Brian MacIntosh's affidavit. (Doc. No. 11). In response to the Court's November 8 Order, Defendants filed an unsigned Affidavit of Dedria Ryan and emails between Dedria Ryan and Clif Gentle regarding a termination offer between Juice Bar and another I Love Juice Bar franchise. (Doc. No. 12).

**LEGAL STANDARD**

Temporary restraining orders ("TRO") and preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). A TRO should be granted only if the movant carries his burden of proving that the circumstances clearly demand it.

4

*Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). The court must consider and balance four factors in determining whether to afford such relief: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997), they do not carry equal weight. Regarding the third factor, irreparable harm, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" *D.T. v. Sumner Cty. Schools*, 2019 WL 5850408, at *2 (6th Cir. Nov. 8, 2019); *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a *sine qua non* for issuance of an injunction."). Furthermore, "[a] finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F. 3d 620, 625 (6th Cir. 2000). In deciding whether to grant the requested TRO, the Court makes its evaluation of these factors based on the current record. The Court does not intend to suggest that any of its findings herein are not subject to potential change at later stages in this case based on a changing record.

## DISCUSSION

### A. Likelihood of Success on the Merits

Under the first factor, the court considers whether the movant has demonstrated a strong or substantial likelihood of success on the merits of its claims. *NAACP v. City of Mansfield*, 866 F.2d 162, 166-67 (6th Cir. 1989). Here, Plaintiff brings five claims against Defendants including: (1) breach of contract; (2) misappropriation of trade secrets; (3) trademark infringement; (4) trade

dress infringement; and (5) unfair competition. (Doc. No. 4 at 15-16). The Court concludes that Plaintiff has shown a likelihood of success on the merits at least as to its claims for breach of contract and trade dress infringement.

　　　　1.　Breach of Franchise Agreements

Plaintiff argues that Defendants breached the Franchise Agreements by (1) failing to pay royalty fees and/or other amounts owed to Plaintiff, (2) opening and operating a competing business under the name Queen City Juicery and Wellness Bar, and (3) failing to grant Plaintiff access to its new Point of Sale system and sales and royalties data affiliated with Queen City Juicery and Wellness Bar. (Doc. No. 4 at 15). Tennessee law governs this dispute. (Doc. No. 4-1 at 33 ("This Agreement shall be governed by the laws of Tennessee[.]"); *id.* at 92 (same)). Under Tennessee law, "a viable claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract; and (3) damages caused by the breach of the contract." *Lewis v. MedAssets Net Revenue Sys., LLC*, No. 3:11-cv-0387, 2012 WL 3061855, at *10 (M.D. Tenn. July 26, 2012) (citing *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006))[4].

Plaintiff claims that it has satisfied the first element, because the Franchise Agreements constituted an enforceable contract with particular provisions that Defendants breached. In response, Defendants argue that Plaintiff lacks "an enforceable franchise agreement" because the Franchise Agreements were terminated by Defendants' acceptance of the Termination Offer on (or about) September 19, 2019, thus creating a binding agreement (the "purported termination agreement") whereby the Franchise Agreements were terminated as of that date. (Doc. No. 10 at

---

[4] Defendants do not contest that the Tennessee choice-of-law provision in the Franchise Agreements is valid or that the parties' contractual dispute is governed by Tennessee law.

4-6). Defendants imply that because (according to them) the Franchise Agreements were terminated as of September 19, Defendants could not thereafter have breached the Franchise Agreements.

The Court disagrees. Based on the existing record, the Court finds that the Termination Offer was never accepted; therefore, the purported termination agreement in fact never came into existence and thus did not terminate the Franchise Agreements.[5]

Under basic principles of contract law, there must be a meeting of the minds regarding the terms of the contract. *Sweeten v. Trade Envelopes, Inc.*, 938 S.W.2d 383, 386 (Tenn. 1996). Accordingly, "[a]cceptance of an offer must be exactly and precisely in accord with the terms of the offer." *Westfall v. Brentwood Serv. Group, Inc.*, No. E2000-01086-COA-R3-CV, 2000 WL 1721659, *5 (Tenn. Ct. App. Nov. 17, 2000) (citing *Ray v. Thomas*, 191 Tenn. 195, 232 S.W.2d 32, 35 (Tenn.1950)). "Unless an acceptance mirrors the offeror's terms, neither omitting nor adding terms, it has no legal effect as an acceptance and operates as a rejection and a counter offer." *Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 36 F.3d 540, 546 (6th Cir.1994) (citing *Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 257 S.W. 398 (1924)).

According to Defendants, shortly after providing them with the Termination Agreement, Ryan, acting in her capacity as CEO of Juice Bar, amended the terms of the Termination Agreement by authorizing the removal of the provision for a $5000 termination fee and the noncompetition provision. Defendants allege that "[i]n the case of [ILJB Charlotte], Ms. Ryan confirmed her intent to have her emails allowing the removal of these terms confirm her

---

[5] The Court notes that even if the purported termination agreement actually had come into effect as Defendants claim, that would not necessarily mean that Defendants could not have breached the Franchise Agreements. By their terms, the Franchise Agreements (in paragraph 32) imposed upon Defendants (breachable) obligations that extended beyond the time of termination of the Franchise Agreements. (Doc. No. 4-1 at 28, 87).

amendments to the agreement." (Doc. No. 10 at 4). In further support of this assertion, Defendants

cite to the Affidavit of Brian MacIntosh, which states:

> In response to a request that Ms. Ryan waive the termination fee provision and the
> noncompetition provision, Ms. Ryan advised me that these provisions were to be
> stricken form [sic] the December 31, 2018 document and then provided email
> confirmation of this change.

(Doc. No. 10-1 ¶ 8). As discussed above, the Court ordered Defendants to file Dedria Ryan's

"emails [plural]" referenced in the last full sentence of page four of the Response confirming her

intent to have her emails amend the Termination Agreement and, if not encompassed among those

emails, the "email confirmation" referenced in paragraph eight of Brian MacIntosh's affidavit.

(Doc. No. 11). But the documents that Defendants filed in response to the Court's Order do not

include any emails matching the description of the emails they referenced in the Response. Instead,

Defendants filed an unsigned proposed affidavit of Dedria Ryan and an email chain between

Dedria Ryan and Clif Gentle in February 2019 (before Gentle became a co-owner of ILJB

Charlotte) regarding a termination offer for Gentle's Mooresville I Love Juice Bar franchise.

As an initial matter, the Court will not consider the unsigned proposed affidavit.[6] As the

Sixth Circuit has recognized, "an 'unsigned affidavit' is a contradiction in terms. By definition an

affidavit is a 'sworn statement in writing made ... under an oath or on affirmation before ... an

authorized officer.'" *Sfakianos v. Shelby County Government*, 481 F. App'x 244, 245 (6th Cir.

2012) (quoting *Mason v. Clark*, 920 F.2d 493, 495 (8th Cir. 1990)). The unsigned proposed

affidavit here is, therefore, simply a nullity.

Furthermore, the emails discussing an unrelated termination agreement do not evidence the

purported amendment to the Termination Offer. Based on the present record, Defendants'

---

[6] The Court understands that Defendants' counsel may never have expected otherwise and instead
anticipated filing a signed version soon thereafter. But that has not happened.

execution and return of the Termination Agreement striking the $5000 termination fee and the noncompetition provision effected a counteroffer, which Plaintiff never accepted and in fact expressly rejected. (Doc. No. 4-4). Therefore, the Franchise Agreements—the enforceability of which is not otherwise contested—was not terminated by the purported termination agreement, which in fact never became effective. Therefore, the Franchise Agreements remained in effect and enforceable until at least October 7, when Plaintiff sent Defendants a notification of termination. (Doc. No.4-5). By this time, Defendants had been operating independently of the I Love Juice Bar banner for some period of time, *i.e.*, since on or about September 19. (Doc. No. 10-1 at 2). Thus, Plaintiff is likely to be able to show that Defendants' allegedly breaching conduct occurred during a period in which he Franchise Agreements were in effect.

As to whether Defendants' conduct actually amounted to a breach of the Franchise Agreements, Defendants do not contest that they (1) failed to pay royalty fees and/or other amounts owed to Plaintiff; (2) opened and operated a "[c]ompeting [b]usiness" under the name Queen City Juicery and Wellness Bar; and (3) failed to grant Plaintiff access to its new Point of Sale system and sales and royalties data affiliated with Queen City Juicery. Instead, Defendants argue only that these actions did not amount to a breach of the Franchise Agreements because the Franchise Agreements had already been terminated. But the Court has already rejected the contention that the Franchise Agreements were terminated by the purported termination agreement. Thus, because Defendants do not contest that their actions violated the Franchise Agreements if (contrary to Defendants' unsubstantiated position) they were not terminated prior to October 7, the Court has

little difficulty finding that, for the purposes of issuing a TRO, Plaintiff will likely succeed on the merits of its breach of contract claim.[7]

In addition, the Court finds that Defendants likely have breached Section 32 of the Franchise Agreements, including, *inter alia*, Section 32(c), which requires Defendant ILJB Charlotte, upon termination or expiration of the Franchise Agreements, not to use or adopt the Franchise System or any of the Propriety Marks or Intellectual Property. (Doc. No. 4-1 at 24). The Franchise Agreements define Propriety Marks as "the registered and unregistered distinctive and characteristic trade names, domain names, trademarks, service marks, logotypes, and trade dress elements that we designate in written or electronic form or through usage from time to time as prescribed for use with the Franchised System." (*Id*. at 32). Although, as discussed below, the Court does not find that Plaintiff has provided enough information to sustain a claim for trademark infringement under the Lanham Act, it is clear to the Court that Defendant continued to use certain of Plaintiff's marks and thereby breach of the Franchise Agreements. Specifically, Plaintiff has shown:

> As of 4:25 p.m. on November 8, 2019, the first 14 pages of the Photos subpage of QCJ's Facebook page alone prominently featured at least 182 separate depictions of Juice Bar's marks, via Juice Bar-branded bottles, cups, growlers, carafes, shot capsules, product packaging, promotional advertisements, gift cards, internal and external store signage, smart phone apps and gift bags. See Exhibit 1 at 3-14. Similarly, as of 11:25 a.m. on November 5, 2019, the most recent posts on QCJ's Instagram feed featured no fewer than 29 separate depictions of Juice Bar's marks, via Juice Bar-branded cups, bottles, growlers, tee shirts and in-store signage. See Exhibit 2 at 3-9.

---

[7] Plaintiff argues that it has shown that it has suffered damages from Defendants' breach in the form of ongoing irreparable harm stemming from the "unauthorized use of its intellectual property and confidential and proprietary business information." (Doc. No. 4 at 16).

(Doc. No. 14 at 5). Accordingly, on the current record, the Court finds that although Defendants' use of Plaintiff's marks does not necessarily constitute trademark infringement under the Lanham Act, it does amount to a breach of the Franchise Agreements.

### 2. Misappropriation of Trade Secrets

Trade secrets are protected in Tennessee by the Tennessee Uniform Trade Secrets Act ("TUTSA"). *See* Tenn. Code Ann. § 47–25–1702(1) *et seq.* To succeed on a claim for misappropriation of trade secrets, Plaintiff must show "(1) the existence of a trade secret; (2) misappropriation of the trade secret by the defendant; and (3) resulting detriment to the plaintiff." *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 962 (M.D. Tenn. 2011).

Under TUTSA, for information to be considered a trade secret, "(1) the information must derive independent economic value from not being generally known, (2) others could obtain economic value from its disclosure or use, and (3) efforts have been made to maintain its secrecy." *J.T. Shannon Lumber Co. v. Barrett*, No. 2:07-cv-2847, 2010 WL 3069818, at *4 (W.D. Tenn. Aug. 4, 2010) (citing Tenn. Code Ann. § 47–25–1702(4)). In analyzing trade secrets, Tennessee courts employ a six-factor test, which essentially restates the requirements in the statutory definition:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of money or effort expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 983 (M.D. Tenn. 2008) (citing *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)).

Plaintiff asserts that "I Love Juice Bar's menu items, recipes, ingredients, pricing structure, sales strategies, customer information, and general operations all constitute trade secrets that are

entitled to protection[.]" (Doc. No. 4 at 18). First, Plaintiff argues that "Juice Bar's business is its System, comprising, in large part, its menu, recipes and methods, and Defendants have wrongfully misappropriated that System, in clear violation of the Tennessee Trade Secrets Act." (Doc. No. 14 at 4).[8] But Juice Bar's menu items, recipes, and ingredients do not fall within the definition of a "trade secret" under TUTSA. Juice Bar's menu, which Plaintiff attached to its Motion and is displayed on Plaintiff's website, clearly lists the ingredients of each juice and smoothie. (Doc. No. 4-6). Additionally, Plaintiff has not shown that that there is anything unique about its recipes such that they derive independent economic value from not being generally known. Rather, the Court believes that the step-by-step recipes for blending a smoothie are not nearly as intricate or unknown as, for example, baking a cake or creating ice cream; Plaintiff certainly has not shown the Court otherwise. Because it appears on the current record that the menu items, recipes, and ingredients are generally known and that efforts have not been made to keep them secret, the Court cannot find that they constitute trade secrets under TUTSA.

In support of its argument that its menu, recipes, and methods are trade secrets, Plaintiff cites *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122-23 (6th Cir. 2019). In *Handel's,* although the Sixth Circuit did classify as trade secrets Handel's ice cream recipes and unique ingredients, the record clearly established "that the information provided to Defendants regarding Handel's operations and procedures was not known outside the business, [and] was heavily restricted with confidentiality agreements . . ." *Id.* at 123 (emphasis added). By contrast,

---

[8] Defendants do not address the merits of Plaintiff's misappropriation of trade secrets, trademark infringement, trade dress infringement, or unfair competition claims. Defendants merely argues that "[w]hether the Plaintiff can succeed on the merits depends entirely upon a factual determination of whether the franchise termination agreement was, in fact, effectively executed." (Doc. No. 10 at 6). Thus, Defendant apparently concedes that the Court, given its resolution of that issue, should find the Plaintiff is likely to succeed on the merits. As set forth herein, consistent with that view, the Court finds a likelihood of success on some but not all of Plaintiff's five claims.

Juice Bar's menu items, recipes, and ingredients were not similarly protected. Rather, Plaintiff published its menus (containing its list of ingredients) online and also presumably displays the menu in all of its stores.[9]

As to Plaintiff's customer information, the Court finds that Plaintiff has not shown that such information amounts to a trade secret under TUTSA. First, Plaintiff has not shown how such information is economically valuable. Second, Plaintiff has not shown what it has done to keep customer information confidential. Customer lists do not automatically constitute trade secrets. *See Heyer–Jordan & Assoc., Inc. v. Jordan*, 801 S.W.2d 814 (Tenn. Ct. App. 1990) (finding that customer identities and other customer-related information cannot be trade secrets when the information is available from sources other than the employer). Rather, "[c]ustomer lists . . . [are] protectable only to the extent that it satisfie[s] the definition of a trade secret." *Hamilton–Ryker Grp., LLC v. Keymon*, No. W2008–00936–COA–R2–CV, 2010 WL 323057, at *13 (Tenn. Ct. App. Jan. 28, 2010). Here, Plaintiff does not allege information sufficient to show that its customer lists constituted a trade secret.

Finally, the Court finds that Plaintiff has not sufficiently established that its pricing structure, sales strategies, and general operations constitute trade secrets under TUTSA. Plaintiff simply does not demonstrate how the information derives independent economic value from not being generally known, how others could obtain economic value from its disclosure or use, or what efforts Plaintiff has taken to maintain its secrecy. Tenn. Code Ann. § 47–25–1702(4); *see Vincit*

---

[9] Plaintiff claims that the names of 12 different items appearing on Plaintiff's menu are "extraordinarily similar" to the respective names for the same items appearing on Defendants' menu. (Doc No. 4 at 4). The Court is at a loss as to how Plaintiff could make this claim; in the Court's view, none are extraordinarily similar, five are somewhat similar (due only to having a single word in common, usually the name of an ingredient in the item, such as "coffee" or "greens"), and seven are dissimilar.

*Enterprises, Inc. v. Zimmerman*, No. 1:06-cv-57, 2006 WL 1319515, at *6 (E.D. Tenn. May 12, 2006) (finding that plaintiff failed to allege that confidential information relating to the products, pricing, customers, sales methods, manner of operation, plans, processes, and other trade secrets and proprietary information of plaintiff had "independent economic value").

Although Plaintiff argues that that it "takes great care to keep its proprietary and confidential business information confidential" and that it "requir[es] all employees to agree, upon hire, not to disclose its Confidential Information" (Doc. No. 4 at 10), it is not clear to the Court that the confidential information included its pricing structure, sales strategies, and general operations. In fact, the Franchise Agreements define confidential information as "any trade secrets we own or protect and other proprietary information not generally known to the juice bar industry including confidential portions of the Operations Manual and information we otherwise impart to you and your representatives in confidence [and] recipes, food preparation instructions, proprietary software and other valuable property." (Doc. No. 4-01 at 34). It is not clear either that this definition includes pricing structure, sales strategies, and general operations or that the Operating Manual (parts of which were designated confidential) contained Defendants' pricing structure, sales strategies, and general operations.[10] Plaintiff therefore has not shown that it took efforts to maintain the secrecy of its pricing structure, sales strategies, and general operations. Accordingly, because Plaintiff has not shown that its pricing structure, sales strategies, and general operations

---

[10] Plaintiff's reliance on *Handel's* is misplaced here also. In *Handel's*, the plaintiffs provided evidence showing that "the Manual contained the 'specifications, standards, and procedures' for operating a Handel's franchise; the Franchise Agreement described the confidential information given to Defendants as the 'total knowledge of [Handel's] System, and construction, operation, and promotion'; and the in-person training provided sensitive information to Defendants." *Handel's*, 765 F. App'x at 122-23. In comparison, Plaintiff here has not shown or even alleged that the pricing structure, sales strategies, and general operations were contained in its Operating Manual. Nor has Plaintiff shown that this information is encompassed within the Franchise Agreements' definition of Confidential Information.

derived economic value from not being generally known or that Plaintiff took steps to keep such information confidential, the record before the Court does not support a finding that Plaintiff's pricing structure, sales strategies, and general operations constitute trade secrets under TUTSA.

### 3. Trademark Infringement

Under the Lanham Act, trademark infringement occurs when "any person . . . without the consent of the registrant[,] use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1). "To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the [allegedly infringing] mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)).

At this point, Plaintiff has not demonstrated that it owns a valid and enforceable *registered* mark that has been infringed. Plaintiff generally asserts that it is a licensee of the I Love Juice Bar trademarks and has used them for nearly five (5) years. (Doc. No. 4 at 21). Plaintiff has attached the original menu from I Love Juice Bar and the new menu from Queen City Juicery, asserting that the menus are "practically identical, in both style and substance, to the juices and smoothies on I Love Juice Bar's menu." (Doc. No. 4 at 21).[11] Plaintiff also argues that Defendants continue

---

[11] Plaintiff also attaches as Exhibit Seven to its Motion "[p]hotographs reflecting Defendants' wrongful, post-termination use of I Love Juice Bar's marks online[.] (Doc. No. 4 at 22; Doc. No. 4-7). This exhibit contains snapshots of Queen City Juicery's Instagram page displaying I Love Juice Bar's smoothie bottles with the name "I Love Juice Bar," cups displaying "I Love Juice Bar," and a bottle that displays the name "Queen City Juicery & Wellness Bar." (Doc. No. 4-7). The Court does not know which mark(s) from Exhibit Seven has been (and remains) properly registered.

to serve juices and smoothies in I Love Juice Bar's branded cups and bottles, which have been rebranded with a sticker displaying "Queen City Juicery and Wellness Bar." (Doc. No. 4 at 21). But Plaintiff has failed to even identify what specific mark(s) (registered or even unregistered) Defendants have used allegedly in violation of the Lanham Act. Nor has Plaintiff submitted any documentation evidencing the registration of any mark. *See* 15 U.S.C. § 1057(b) (stating that a certificate of registration on the principal register is deemed "prima facie evidence of the validity of the registered mark.").[12] It is not that the Court finds that Plaintiff is *unlikely* to prevail on the merits of its trademark infringement claim at a later stage, but rather that Plaintiff has not provided enough information establish that it owns the registered trademark. Because the Court cannot determine which registered mark(s) allegedly are being infringed upon, it concludes that Plaintiff has not established a likelihood of success on this claim without the need to determine whether Defendants' use of those marks is likely to cause consumer confusion.

### 4. Trade Dress Infringement

The protection afforded by the Lanham Act extends beyond just the use of wordmarks and symbols and prevents infringement of trade dress. *Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000). Section 43(a) of the Lanham Act creates a "federal cause of action for infringement of marks and trade dress that have not obtained federal registration." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760–61 (6th Cir. 2005); 15 U.S.C. § 1125(a). "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying

---

[12] In its Verified Complaint, Plaintiff states that "ILJB Holdings owns numerous federal registrations for the mark "I Love Juice Bar" or derivation thereof, as well as related marks. Each of these registrations is in full force and effect. Each registration is prima facie evidence of the validity of the registration . . ." (Doc. No. 1. ¶ 15). Plaintiff is correct that a certificate of registration is prima facie evidence of the trademark's validity. However, Plaintiff's description of the mark "I Love Juice Bar" does not sufficiently identify for the Court which allegedly registered mark it is referencing, nor has Plaintiff provided any evidence of such registrations.

characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (brackets, ellipsis, and internal quotation marks omitted). Trade dress "involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Id.*

To succeed on a trade dress infringement claim under the Lanham Act, a plaintiff must prove: "1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch*, 280 F.3d at 629.

First, the Court finds that Plaintiff's trade dress is distinctive. "[T]rade dress can be distinctive in one of two ways: (1) trade dress is inherently distinctive if its intrinsic nature serves to identify a particular source, and (2) trade dress has acquired distinctiveness if it has developed secondary meaning, which occurs when, in the minds of the public, the primary significance of the trade dress is to identify the source of the product rather than the product itself." *Kano Labs., Inc. v. Clenair Mfg., Inc.*, No. 3:12-cv-1209, 2013 WL 5758651, at *2 (M.D. Tenn. Oct. 24, 2013) (citing *Wal–Mart Stores, Inc.*, 529 U.S. at 210–11). "Like trademarks, the inherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993); *AMD Southfield Mich. Ltd. P'ship v. Mich. Open MRI LLC*, 337 F. Supp. 2d 978, 982 (E.D. Mich. 2004).

Here, the elements of Juice Bar's bottle that compose its trade dress include: (1) a clear plastic bottle rectangular at its base with sides rising essentially perpendicular from its base before beveling at the top of the bottle; (2) a black cap; (3) a label with a white circle outlined by a thin dark line surrounding the Juice Bar name; (4) a list (in white) of juice names including: "Orange You Glad," "We Got The Beet," "Sweet Greens," "Ginger Greens," "Fresh Greens," and "Coco Pro"; (5) heart-shaped bullet points next to each name on the list; and (6) the words "Shake Well" (in white) at the bottom of the bottle. Although some of these elements are clearly generic or descriptive, when considered as a whole, the arrangement of each element on Plaintiff's packaging is at least suggestive. *See Paddington*, 996 F.2d at 584 ("While each of these elements, individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness."); *The Sherwin–Williams Company v. JP International Hardware, Inc.*, 988 F. Supp. 2d 815, 819 (N.D. Ohio 2013) (finding the arrangement and selection of design elements on a paintbrush package to be arbitrary).

In *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846 (E.D. Mich. 1997), the court held that the trade dress of the Don Marcos tortillas packaging, including "the tone, layout and ratios of the colors; the depiction of a male figure wearing a sombrero with stalks of wheat or corn on each side of the figure; the style and size of the lettering, including the words "Tortillas", "Don," "Quality," "Microwaveable" and the text indicating both the number and composition of the tortillas; all contribute to the overall appearance of the product's packaging which is 'undeniably arbitrary.'" *Id.* at 850; *see also Paddington Corp.*, 996 F.2d at 584 (finding a bottle's trade dress arbitrary because "the tone and layout of the colors, the style and size of the

lettering, and . . . the overall appearance of the bottle's labeling . . . were selected from an almost limitless supply of patterns, colors and designs").[13]

The second element of a trade dress claim requires the Court to determine whether the trade dress is functional. "[A] product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Leapers, Inc. v. SMTS*, LLC, 879 F.3d 731, 736 (6th Cir. 2018) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). Here, it is clear that Juice Bar's label, including listing its unique juice names next to a respective heart shape, is not functional.[14] *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-cv-10983, 2008 WL 1735371, at *6 (E.D. Mich. Apr. 14, 2008) (finding that the "overall product packing image—the color scheme, fonts, and most significantly the graphical depiction of the landscape and figure" was not functional and created a protected overall product image" ).

Finally, the Court finds that Defendants' use of Plaintiff's trade dress is likely to cause consumer confusion. In doing so, this Court is guided by the Sixth Circuit's opinion in *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir.1982). In *Frisch's*, the Sixth Circuit identified an eight factor test for determining a likelihood of confusion:

1. strength of plaintiff's [trade dress];

2. relatedness of the goods;

---

[13] Since the Juice Bar trade dress is inherently distinctive, and therefore protectable under the Lanham Act, the secondary meaning analysis is unnecessary.

[14] Although a unique and nonfunctional bottle shape can attribute to a product's overall distinctiveness, the shape of a bottle containing liquid, in itself, is typically a non-protected functional element of a product's trade dress. *See, e.g., Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 396–97 (D.N.J.1989) (holding that for the purposes of a preliminary injunction a "waisted bottle" design for a well-known mouthwash was functional, and not distinctive); *Vital Pharms., Inc. v. American Body Bldg. Prods., LLC*, 511 F. Supp. 2d 1303, 1314 (S.D.Fla.2007) (observing that a bottle neck, "absent a whimsical, non-functional design," was functional to dispensing liquid).

3.  similarity of the [trade dress];

4.  evidence of actual confusion;

5.  marketing channels used;

6.  likely degree of purchaser care and sophistication;

7.  defendant's intent in selecting the [trade dress]; and

8.  likelihood of expansion of the product lines using the [trade dress].

*Id.* at 647. Here, the Court finds that there is a high likelihood of consumer confusion. First, Plaintiff argues that "Defendants' Competing Business is still serving juices and smoothies in I Love Juice Bar branded cups, and are serving smoothies in the same distinctively shaped and branded bottles used by I Love Juice Bar." (Doc. No. 4 at 21-22). In fact, it appears that Defendants have merely affixed to the bottle, on top of the label with the white circle surrounding the Juice Bar name, a "Queen's City Juicery" sticker. Despite this makeshift concealment, such bottles "are still clearly displaying I Love Juice Bar's registered heart-shaped bullets and signature juice names . . ." *Id.* A quick comparison of the two bottles clearly supports Plaintiff's argument. The following image, displayed on the Queen City Juicery website and attached as Exhibit Seven to Plaintiff's Motion, shows a plastic smoothie bottle with a black cap. (Doc. No. 4-7 at 2). It displays the sticker "Queen City Juicery & wellness bar." Below the sticker, it lists five juices: "Orange You Glad," "We Got The Beet," "Sweet Greens," "Ginger Greens," "Fresh Greens," and "Coco Pro."



(Doc. No. 4-7). Notably, none of the names listed on the Queen City Juicery bottle are listed on Queen City Juicery's menu. All of these names, however, are listed on Juice Bar's menu. Furthermore, the below image, taken from Juice Bar's website, shows plastic bottles with nearly identical labels as the one displayed on Queen City Juicery's website, listing the same juice names, in the same order, next to the same hearts, and above the words "shake well".



https://ilovejuicebar.com/our-menu (last visited Nov. 13, 2019). The only difference between the packaging is that these bottles are labeled "Juice Bar" with a heart over the "i." It is clear that Queen City Juicery has merely attempted to rebrand Juice Bar's bottle by placing a Queen City Juicery sticker over the Juice Bar name. In short, Defendants are using a nearly identical bottle, selling nearly identical products, out of Plaintiff's formerly franchised store. Defendants also are

advertising from an Instagram account that was originally created by the ILJB Charlotte franchise with an I Love Juice Bar handle. (Doc. No. 4 at 7). Accordingly, the Court has little difficult finding that there is a high likelihood of consumer confusion.

Therefore, for the purposes of issuing a Temporary Restraining Order, Plaintiff will likely succeed on the merits of its trade dress infringement claim.

### 5.   Unfair Competition

Finally, Plaintiff argues that it is likely to succeed on its unfair competition claim because it has established a likelihood of confusion regarding Defendants' use of Plaintiff's trademarks. Specifically, Plaintiff alleges that "[a]s to unfair competition, the Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by others is likely to confuse consumers as to the source of the product." (Doc. No. 4 at 24). Section 43(a) of the Lanham Act prescribes civil liability for:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

15 U.S.C. § 1125(a). A claim under Section 43(a) of the Lanham Act "prohibits a broader range of practices than does § 32, which applies to registered marks, . . . it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos*, 505 U.S. at 768 (internal citation and quotation marks omitted). However, to sustain a claim for unfair competition under Section 43 of the Lanham Act, a plaintiff "must show that it owns a valid trademark eligible for

protection." *G.M.L., Inc. v. Mayhew*, 188 F. Supp. 2d 891, 895 (M.D. Tenn. 2002) (*quoting EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 62 (2nd Cir. 2000)). Here, Plaintiff has failed to even identify its ownership of any specific registered mark or unregistered mark eligible for registration in accordance with the Lanham Act. Accordingly, Plaintiff has not provided sufficient information to establish a likelihood of success as to its unfair competition claim.

B. Irreparable Harm

The Court finds that, absent a temporary restraining order, Plaintiff is likely to suffer irreparable harm. Specifically, Plaintiff has suffered, and will continue to suffer, competitive losses and losses of customer goodwill as a result of Defendants' breach of the non-compete provision of the Franchise Agreements and Defendants' infringement of Plaintiff's trade dress.

Tennessee courts have found that the breach of a covenant not to compete can cause irreparable damage. *See Medical Educ. Assistance Corp. v. State ex. Rel. East Tennessee State Univ. Quillen Coll. of Med.*, 19 S.W.3d 803, 815-16 (Tenn. Ct. App. 1999). "The loss of customer goodwill and injuries that are a consequence of unfair competition are difficult to compute and certainly constitute irreparable harm*." AmericaGas Propane v. Cook*, 844 F. Supp. 379, 390 (M.D. Tenn. 1993); *Green Ballast, Inc. v. Bethell*, No. 13-cv-2601, 2013 WL 12147028, at *18 (W.D. Tenn. Oct. 10, 2013) (granting a preliminary injunction enjoining defendants from: (1) doing business with current or former employees, vendors, or independent contractors of plaintiffs; (2) doing business with current, former or future customers of plaintiff for the purpose of engaging in competing business with the plaintiff; (3) disclosing confidential information about plaintiff; and (4) interfering with plaintiffs relationships with any third party).

Additionally, in *Basicomputer Corp v. Scott*, 973 F.2d 507 (6th Cir. 1992), the Sixth Circuit affirmed a decision by the district court that held that the plaintiff "would suffer irreparable injury in the absence of a preliminary injunction. . . . [because] [the plaintiff] had suffered, and would continue to suffer, competitive losses and losses of customer goodwill as a result of the defendants' [breach of a non-competition provision]." *Id.* at 511–12. In particular, the Sixth Circuit held that "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Id.* (citing Overholt Crop Ins. Serv. Co. v. Travis, 941 F.2d 1361, 1371 (8th Cir.1991) (holding that irreparable harm can be inferred from insurance sales representatives' breach of non-competition covenant)).

Additionally, in trademark cases, including cases alleging trade dress infringement, courts have found that unauthorized use of a plaintiff's trade dress cannot be fully compensated and therefore amounts to irreparable harm. *Dunkin' Donuts Franchising LLC v. Oza Bros.*, No. 10-13606, 2012 WL 4498118, at *9 (E.D. Mich. Sept. 28, 2012)("[I]rreparable harm is generally presumed on a showing of likelihood of confusion.").

Accordingly, Plaintiff has established that, absent an immediate order enjoining Defendants from operating a competing business and using Plaintiff's trade dress, Plaintiff is likely to suffer irreparable harm.

C. <u>Substantial Harm to Defendant and Others</u>

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). "In considering this factor, the Court must (1) balance the harm [p]laintiff would suffer if its request for a preliminary injunction were denied against the harm [d]efendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Georgia–*

*Pacific Consumer Prods. LP*, No. 1:09–318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009); *Accord Trenton Corp. v. Superior Corrosion Control, Inc.*, No. 06–15699, 2007 WL 268792, at *6 (E.D. Mich. Jan. 25, 2007).

The Court recognizes that certain third parties (such as employees of Defendant) would be likely to suffer as a result of a temporary restraining order enjoining the operation of Queen's City Juicery in all respects. However, the harm to third parties can be minimized by limiting the scope of the injunction, as discussed below. Although the Court finds that enjoining Defendants from operating a "[c]ompeting [b]usiness," as prohibited by the Franchise Agreements, will cause Defendant harm, it is not the kind of harm that weighs in Defendants' favor. *See Leaf Funding, Inc. v. Butera*, No. 3:06-cv-00938, 2006 WL 2868976, at *4 (M.D. Tenn. Oct. 5, 2006) ("[The Court perceives no harm to the Defendants who are signatories to the Master Lease and Addendum because the temporary restraining order will merely prohibit them from violating the Master Lease[.]"). In the Franchise Agreements, Defendants agreed not to operate a competing business. Therefore, the harm that Defendant will suffer from enjoining such conduct is not harm created by the injunction but rather harm that Defendants brought upon themselves when they agreed not to operate a competing business. Further, the injunction prevents Defendants only from operating a "[c]ompeting [b]usiness," not from carrying on an enterprise that does not qualify as a "[c]ompeting [b]usiness." Accordingly, the substantial-harm factor weighs in favor of issuing a temporary restraining order.

D.  Public Interest

The last factor in determining whether to grant a temporary restraining order "asks whether the public interest is advanced in issuing" the order. *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 n. 4 (6th Cir. 2003). Plaintiff argues that the

public interest favors granting the temporary restraining order because "fair competition and enforcing contractual obligations are in the public interest." (Doc. No. 4 at 28). The Court agrees.

Under Tennessee law, "parties are free to contract as they see fit" and courts are to "defer to the contracting process by enforcing contracts according to their plain terms." *Seraphine v. Aqua Bath Co., Inc.*, No. M2000-02662-COA-R3CV, 2003 WL 1610871 at *9 (Tenn. Ct. App. Mar. 28, 2003). The public has an interest in protecting and preserving the integrity of contracts in Tennessee. Issuance of a temporary restraining order that seeks to enforce rights under a written contract will serve the public's interest.

The public interest will also be served by enjoining aesthetic packaging trade dress infringement because it will prevent customer confusion in the marketplace. *See Tumblebus Inc.*, 399 F.3d at 760; *Spangler Candy Co. v. Tootsie Roll Indus., LLC*, 372 F. Supp. 3d 588, 609 (N.D. Ohio 2019).

E. Scope of the Temporary Restraining Order[15]

Based upon the foregoing, the Court finds that the four factors to be considered in ruling on a request for a temporary restraining order are fall in Plaintiff's favor. Accordingly, subject and subsequent to the posting of a bond a discussed below, the Court will issue a Temporary Restraining Order that prohibits the Defendants from:

- Operating a "Competing Business" as defined by the Franchise Agreements, *i.e.*, "any Store serving as its primary menu offering freshly made to order fruit and vegetable juices or smoothies." (Doc. No. 4-1 at 34).

---

[15] The Court will not enjoin some of the conduct that it found to be in breach of the Franchise Agreements, such as nonpayment of certain fees, because harm from such conduct is not irreparable. *Nat'l Viatical*, 716 F.3d at 957 ("[T]he general rule is that a plaintiff's harm is not irreparable if it is fully compensable by money damages[.]").

- Infringing upon Plaintiff's trade dress, including on its cups and bottles the combination of the plastic label with a list (in white) of original juice names including: "Orange You Glad," "We Got The Beet," "Sweet Greens," "Ginger Greens," "Fresh Greens," and "Coco Pro"; heart-shaped bullet points next to each name on the list; and the words "Shake Well" (in white) at the bottom of the bottle.

- Using any Proprietary Marks or Intellectual Property as defined by the Franchise Agreements, including on Queen City Juicery's social media pages.

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, "the rule in [the Sixth Circuit] has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). When determining whether to require the party seeking an injunction to give security, courts have considered factors such as the strength of the movant's case and whether a strong public interest is present. *Id.* at 1176. Under the circumstances of this case, the Court finds that the inevitability of harm to Defendants in the event the TRO proves to have been improvidently granted, the likely approximate amount of damages from such harm, the countervailing strength of Plaintiff's case, and the public interest favor the requirement that Plaintiff post a security bond in the amount of $10,000.00.

The Court therefore will require Plaintiff to post security in the amount of ten thousand dollars ($10,000.00), in a form satisfactory to the Clerk of Court. Upon notification of the posting of such security, the Court intends to issue immediately a TRO as described, and for the reasons, discussed herein.

As to Plaintiff's request for a preliminary injunction, subject to and subsequent to Plaintiff posting the required security, the Court will set a hearing for a date and time prior to the expiration of the TRO.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE